IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

IKE CARTER                                                    PLAINTIFF

VERSUS                          CIVIL ACTION NO.: 4:24-CV-007-MPM-JMV

ILLINOIS CENTRAL RAILROAD
COMPANY                                                      DEFENDANT

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S SUPPLEMENTAL EXPERT REPORT OF DR. WILLIAM O. MCCRANEY

This matter is before the Court on the Plaintiff's Motion to Strike the Supplemental Expert Report of Dr. William O. McCraney [Doc. 231]. The motion, filed August 11, 2025, is now fully briefed and the Court is prepared to rule. As explained more fully below, the Court concludes that the motion to strike should be granted in part and denied in part.

Background

Plaintiff, a machine operator for Illinois Central Railroad Company ("Illinois Central"), claims that he sustained an acute full thickness supraspinatus tear in his left shoulder on January 28, 2021, after a track machine being operated by a co-employee rearended the track machine Plaintiff was operating. After suit was filed on January 19, 2024, and Illinois Central answered denying that the accident caused the reported rotator cuff tear, the Court set the following case management deadlines, which after an initial amendment, ran as follows: April 11, 2025, for Plaintiff's expert disclosures; May 12, 2025, for Illinois Central's expert disclosures; July 14, 2025, for completion of discovery; and December 8, 2025, for trial. [Doc. 198].

On September 24, 2024, Plaintiff was deposed by Illinois Central. Concerning what he experienced in the subject accident, he testified, in relevant part:

Q. My understanding is, at some point either you stopped or were preparing to stop at milepost 18.
Tell me what –
I just want to know how the incident happened, from what you remember.

A. I was headed to the work stop, and after I passed the work site, I was in the process of getting the radio, and that was it. I just was rammed by something. I don't know what happened behind me.

Q. Okay

A. I just know, once I got past the work site and I got ready to tell him that I was about to stop and –
Q. That's when the tamper collided – rear-ended you in the regulator?

A. Yes, sir.

Q. All right. You indicated that your right arm, that you were reaching up. Is that where you would reach for the radio?

A. The radio was up.

Q. So when you were reaching up for the radio, that's when the collision happened?

A. I don't know when it happened. All I know, I went for the radio, and I was rammed –

Q. After you went for the radio is when the collision –

A. – to tell him I was getting ready to slow down – I mean stop.

Q. I'm sorry I didn't mean to cut you off. And then were you seated in the regulator at the time?

A. I had raised up.

Q. So you were kind of a little bit out of your chair reaching for the radio?

A. Uh-huh.

Q. All right. And then were your feet on the floor of the regualor?

A. Yes.

Q. And was your left am – Where was your left arm at the time of the collision?

A. Up on the – like to the side. When I raised up, I was like this here.

Q. Okay

A. This is the console of everything.

Q. What – Was your left hand on anything, or did you just have it like you just indicated? Was it –

A. In the air going for the radio.

Q. That's your right hand. Okay. Your left hand was kind of tucked –

A No, it wasn't tucked. When I raised up, you could – I was just raising up.

Q Okay. All right. So did you ever raise your left hand before the collision?

A I can't remember

Q Was it down kind of by your waist where you indicated as you raised up?

A All I know, I was up. I can't say if it was down or up.

Q. All right. So tell me what happened physically when the collision occurred. Tell me what happened physically to you when the collision occurred.

A Talking about what it did?

Q What it did to your body.

A. It shoved me into the –

Q Console?

A The console, and we had a – it was the old type. We had the –

Q. The levers?

A. Yes, sir.

Q. Okay. Was it one of the older Knox Kershaw regulators, or do you know?

A. I don't know.

Q. Okay, that's fair enough. All right. What party of your body collided with the console?

A. My chest, my shoulder, and just the way it threw me, so I know my shoulder.

Q. Okay Which shoulder collided with the console?

A. My left.

Q. Okay. All right. And so when the collision occurred, it threw you forward? It didn't knock you backwards?

A. I'm sure I jerked, but I'm – I can't answer that.

Q. Okay. But you do recall that your left arm or shoulder collided with the console?

A. That I was thrown into the console, yes.

Q. Okay. All right. How did your left shoulder feel when it got thrown into the console?

A. My body was in pain.

Q. Okay. What on your body was in pain when you got thrown into the console?

A. My shoulder.

Q. What about your back or your neck?

A. I was in pain. I can't say.

Q. I don't know if I asked you this, but did you ever have pain in your back or your shoulder – I mean, excuse me – pain in your back or your neck before this incident?

A. No, sir.

Q. You never had any medical treatment, chiropractic treatment or anything for back or neck pain?

A. I can't answer that question. Im sure I – I can't answer that question. I don't know. You're talking 30, 40, 50 years ago. I don't –

Q. Well, just tell me what you remember.

A. And I don't remember, no, sir.

Q. All right, So when your left arm collided with the console, you felty immediate pain all over your body, including your shoulder?

A. When I hit the console, I felt pain in my upper body, yes, sir.

Q. Describe for me the pain you felt in your left shoulder.

A. I don't even remember anymore. I just know I was hurt, and I was in pain.

Q, All right. And what happened after your collided with the console? What happened after that? Did you sit back in your chair?

A. I don't remember.

> Q. You don't remember, okay. At some point, did you get off your machine?
>
> A. I don't even remember. I don't remember, and – I don't remember.

[Doc. 234] - Exh. 1 at 40-41.

On April 11, 2025, Plaintiff designated and served an expert report from Dr. Trangle. [Doc. 234] at Exh. 22. The report, as relevant to the injury sustained and the mechanism of injury pertinent here, states that Plaintiff sustained an acute full thickness supraspinatus tear in his left shoulder in the subject incident. As to causation, it reads, in relevant part:

> As noted in the deposition of Mr. Carter, he specifically details what happened. He was reaching for the radio on the console in front of him, with his left arm outstretched. He apparently was attempting to mitigate injury by bracing his left hand arm against the console, but he was not successful and his left shoulder painfully hit the console. He felt immediate pain in the left shoulder.
> The mechanism of having his entire body thrown inside the cab and trying to steady himself with his hands against the dashboard, could indeed lead to a tear of the rotator cuff. This is in all likelihood what occurred in this matter.

Exh. 22 to [Doc. 234] at 17.

Dr. Trangle did not disclose or address in his report the fact of, or notes from, a personal interview he conducted with the Plaintiff in anticipation of preparation of his expert report.

Illinois Central timely disclosed Dr. McCraney as an expert on May 12, 2025, and served his expert report and his report of his own medical exam (IME) of Plaintiff. [Doc. 234] at Exh. 2. Dr McCraney's expert report is set forth in relevant part below,[1] but, in short, he opined "…

---

[1] Dr. McCraney's report states:
Although Mr. Carter claims that he never injured his left shoulder prior to the subject incident and was never treated for left shoulder pain prior to the subject incident, medical records reviewed demonstrate that Mr. Carter presented to the Greenwood Leflore Hospital ED for treatment of acute left shoulder injuries in 2004 and again in 2006. Following Mr. Carter's 2004 incident, an x-ray of his left shoulder showed an alteration to his AC joint. As discussed more fully below, Mr. Carter was also treated for bi-lateral shoulder pain in 2016 at Campbell Clinic by Dr. Sherman. Dr. Sherman diagnosed Mr. Carter with bi-lateral rotator cuff impingement and referred Mr. Carter to physical therapy.

Carter's… large rotator cuff tear in his left shoulder developed slowly and asymptomatically over time as the result of impingement which was originally diagnosed in 2016….. His left rotator cuff tear was not the result of any specific trauma sustained in the reported incident." [Doc. 248] at Exh. 3. Of note with regard to the instant motion, Dr. McCraney's report 1) indicates that among the materials he was provided for review was Carter's deposition testimony[2] and 2) it did not reference either the fact of Dr. Trangle's prior expert designation and report, or the facts relied on and/or opinions rendered by Dr. Trangle therein.

Illinois Central then deposed Dr. Trangle on June 26, 2025, wherein he apparently disclosed for the first time the fact that, in preparing his report, he had personally interviewed the

---

Dr. Sherman also recommended ice, compression and rest. I have not seen any medical records showing that Mr. Carter followed Dr. Sherman's recommendation that he undergo physical therapy for his bi-lateral rotator cuff tendonitis in 2016. Physical therapy is normally the first treatment modality recommended for rotator cuff impingement and related pain. Many times, physical therapy is just as effective as surgery for treating rotator cuff pain. Mr. Carter's apparent failure to follow Dr. Sherman's recommendation to undergo physical therapy likely contributed to his left shoulder pathology that was diagnosed and treated in May 2021, nearly 4 months following his reported incident.

Mr. Carter did not report any left shoulder pain upon presentation to Desoto County EMS or the Baptist Desoto Emergency Department. There are no records of complaints, trauma or any positive physical exam or diagnostic findings related to the left shoulder during Mr. Carter's treatment at Baptist Desoto. As reported in the peer-reviewed medical literature, the vast majority of rotator cuff tears are atraumatic in nature and result as the natural progression of shoulder impingement, which is a degenerative, chronic and congenital condition. As previously discussed, Mr. Carter was initially diagnosed with bi-lateral rotator cuff impingement in 2016. His June 8, 2021 CT arthrogram showed a large tear of the supraspinatus with retraction to the level of the glenoid, which is indicative of a slow, degenerative tear of the rotator cuff that developed over time as the result of the impingement originally diagnosed in the 2016.

If Mr. Carter had sustained an acute, massive tear of the rotator cuff in his reported incident, there would have certainly been a report of significant pain in his left shoulder, and physical limitations in his left shoulder would have been noted at the time of injury and found during the physical exam conducted at Baptist Desoto by Dr. Awan. When Mr. Carter presented to the Baptist Desoto ER, he did not complain of any left shoulder pain, all physical exams of his left shoulder were normal, and he had no visible signs of trauma. It is my opinion that Mr. Carter's large rotator cuff tear in his left shoulder which was first diagnosed on June 8, 2021, developed slowly and asymptomatically over time as the result of impingement which was originally diagnosed in 2016, nearly 5 years before his reported incident. It is also possible, but less likely that Mr. Carter's left rotator cuff tear occurred following the subject incident. His left rotator cuff tear was not the result of any specific trauma sustained in the reported incident. It is more likely than not that Mr. Carter's rotator cuff tear in his left shoulder preexisted Mr. Carter's reported incident. His left shoulder rotator cuff tear was treated appropriately with rotator cuff repair. I agree with Mr. Carter's treating surgeon, Dr. Geil, that Mr. Carter needs no future medical treatment for his left shoulder.
[Doc. 248] at Exh. 3.
[2] *See* [Doc. 248], Exh. 3 at 5.

Plaintiff "to get a better history, understand what was going on, his pain pattern, what happened exactly. I wanted to get a better hand on the chronology of events, the chronology and temporal relationship of his symptoms, particularly in his shoulder and the neck issues that he had…" [Doc. 234], Exh. 9 at 20. And, though he took no notes of the interview he conducted, Dr. Trangle explained he "weaved" it "into" his expert report. *Id*. A portion of his deposition testimony regarding the interview of Plaintiff is set out below.[3]

On June 30, 2025, the second day following Dr. Trangle's deposition, (and presumably before the deposition was transcribed) Defendant served what was styled a "supplemental report"

---

[3] Q. When did you first talk to Mr. Carter?
A. I don't remember exactly, but I think…probably it was sometime in January of 2025. I don't remember exactly when.
Q. Okay. And what was the purpose of that conversation?
A. Wanted to get a better history, understand what was going on, his pain pattern, what happened exactly. I wanted to get a better hand on the chronology of events, the chronology and temporal relationship of his symptoms, particularly in his shoulder and the neck issues that he had….
Q. And now that's not listed in your report, the fact that you discussed this with Mr. Carter, correct?
A. I don't remember listing that, you're correct.
Q. Why was that not listed in your report?
A. I didn't take specific notes of the conversation. I weaved into it, what he said. Let me just see. I thought I made some reference to the impressions. Let me just see to make sure. The way I had the conversation with him is that I went through what you see in my report under the current claim, as well as the past claim. I mean I remember our discussion distinctly. I went over it and I said, "Look, you know, you've had problems in the past with your shoulder. Let's talk about them." We went over the different time periods and how long he had problems and issues. And to the extent that he helped me, not all of the things are necessarily in the records. It's reflected in my report, but I don't believe I have a specific reference of having talked to him. Maybe I should have done that.
Q. You said you don't have specific notes from that conversation. Did you take any notes regarding that conversation you had with Mr. Carter?
A. No. What I do is I incorporate it into my report. I don't have specific notes. I don't have specific drafts or anything of that sort.
 ….
Q. All right. Now you have reviewed – well, let me ask you this: As part of your opinion that you believe Mr. Carter sustained a full thickness tear of his supraspinatus tendon in the subject incident are you relying on Mr. Carter's description of that incident?
A. Well, first of all, you mischaracterized what I'm saying. I believe that, ultimately, he developed a full thickness tear that began with a traumatic incident. The description of the incident was described by him when I talked to him. But also, if you look at my report, there is a narrative coming from different sources that also described the incident too.
Q. But in terms of your opinion that he did, in fact sustain a full thickness supraspinatus tear, are you relying, in part, on his various descriptions of how the incident happened?
A. I rely on everything. I mean, everything plays a role. I look at everything and I consider everything. I'm not sure what you mean by the word "relying." But they do play a role. I do synchronize it and I try to integrate the different variations of what happened, I integrate that and come to a conclusion.
[Doc. 234], Exh. 9 at pg. 20; 28.

of Dr. McCraney. While it is set forth in full below,[4] in summary, it essentially regurgitates much

of the original report, but for the first time Dr. McCraney explained that, in his view, the basis of

Dr. Trangle's opinion that Carter suffered a full-thickness supraspinatus tear in his left shoulder

---

[4] In addition to the records and materials listed on Exhibits "1" and "2" to my Expert Report served on May 12, 2025 (the "original report"), I also reviewed the report of Kevin Trangle, M.D. and the additional medical literature listed on the Index attached hereto as Exhibit "3".

I disagree with Dr. Trangle's opinions of the reasons stated in my original report and my Independent Medical Examination report, which are incorporated herein by reference. Dr. Trangle' opinion that Mr. Carter sustained a complete full-thickness tear of his supraspinatus tendon in the subject incident in the manner alleged by Mr. Carter is not supported by reliable scientific evidence or peer-reviewed scientific literature. I am not aware of any peer-reviewed scientific study that finds that the mechanism Mr. Carter describes as having caused his injury is sufficient to cause a full thickness tear· of the supraspinatus tendon. As set forth in the peer-reviewed scientific literature, if Mr. Carter had sustained a full-thickness tear of his left supraspinatus tendon in the subject incident, he would have immediately experienced pain, limitation of motion, and weakness in his left shoulder and arm. As documented in Mr. Carter's medical records produced in this case, all examinations of his should.er by Desoto County EMS and at the Baptist Memorial Hospital-Desoto Emergency Room were completely normal. He did not complain of any pain in his left shoulder. He demonstrated no limitation of motion or weakness in his left shoulder or upper extremity during his physical exams.

Consequently, there is no reliable scientific evidence to conclude that Mr. Carter's full-thickness supraspinatus tear occurred in the subject incident. To a reasonable degree of medical probability, Mr. Carter sustained a full-thickness tear of his supraspinatus tendon prior to the subject incident due to his age, prior shoulder injuries, elevated body mass Index (BMI), and/or due to shoulder impingement related to the shape of his acromion, all of which are supported as causes of rotator cuff tears by the peer-reviewed scientific literature. As reported in the peer-reviewed scientific literature, such tears are often asymptomatic when they are degenerative and occur over time as Mr. Carter's tear did. Additionally, It is not scientifically-reliable for Dr. Trangle to base his conclusions that Mr. Carter sustained a full-thickness supraspinatus tear in the subject incident on Mr. Carter's self-report or allegations. Peer reviewed scientific literature establishes that the premise that examinee reports are accurate ~as repeatedly failed scientific testing. *See* Barth, Robert J. Ph.D., *Examinee Reported History Is Not a Credible Basis for Clinical or Administrative Decision Making,* American Medical Association Guide's Newsletter (Sept./Oct.2009). Scientific tests have further demonstrated that such histories are highly vulnerable to inaccuracies, specifically including inaccuracies that will mislead clinicians in their diagnostic, causation, and impairment evaluation work, and that will mislead administrators in their decision making. *Id.* The unreliability of examinee reports is especially pronounced when, as in this case, the examinee has filed a lawsuit.

Consequently, reports from examinees are not a credible basis for clinical, forensic, or administrative decision making. *Id.* Additionally, the peer-reviewed scientific literature establishes that an examinee's underreporting of his prior medical history is especially pronounced in certain circumstances. For example, when examinees believe that a specific event (such as Mr. Carter's accident) is the cause their current complaints, they are more likely to underreport their health history for the time preceding that event and to overstate the extent of their problems for the time period that follows that event. *Id.* As further reported in the peer-reviewed scientific literature; claimants systematically distort their reported medical history in a fashion that potentially inflates the financial compensation for their claims. *Id.* One illustrative example in this case of this issue is Mr. Carter's repeated failure to disclose and/or his denial of the clear existence of his long-standing history of preexisting shoulder injuries, conditions, pain, disorders, rotator cuff impingement and related medical treatment to his experts and treating physicians. Another example is Mr. Carter's claim that he cannot return to work in any capacity due to his alleged ongoing left shoulder pain despite being released to return to medium level Work more than 3 years ago by his treating surgeon. All opinions expressed in this report are stated to a reasonable degree of medical probability. I reserve the right so supplement or amend this report in the event additional information becomes available.

[Doc. 248] - Exh 7

was Carter's self-report of how the accident occurred (also known as the "mechanism of injury"), and he opines that reliance on the same to assess the cause of Plaintiff's full thickness tear is scientifically unreliable. Consistent therewith, he asserts that he is unaware of any peer-reviewed scientific study that finds the mechanism Carter describes as having caused his injury to be sufficient to cause a full thickness tear of the supraspinatus tendon. He also cites literature in support of this opinion, and he further states that the literature bears out that:

> [W]hen examinees believe that a specific event (such as Mr. Carter's accident) is the cause their current complaints, they are more likely to underreport their health history for the time preceding that event and to overstate the extent of their problems for the time period that follows that event. *Id.* As further reported in the peer-reviewed scientific literature; claimants systematically distort their reported medical history in a fashion that potentially inflates the financial compensation for their claims. *Id.* One illustrative example in this case of this issue is Mr. Carter's repeated failure to disclose and/or his denial of the clear existence of his long-standing history of preexisting shoulder injuries, conditions, pain, disorders, rotator cuff impingement and related medical treatment to his experts and treating physicians. Another example is Mr. Carter's claim that he cannot return to work in any capacity due to his alleged ongoing left shoulder pain despite being released to return to medium level Work more than 3 years ago by his treating surgeon.

[Doc. 248] at Exh 7.

Discovery expired in the case on July 14, 2025. Dispositive and *Daubert* challenges to experts were due on August 11, 2025. No dispositive motions were filed and only Plaintiff's expert Dr. Trangle was challenged in a *Daubert*-type motion. Instead, Plaintiff sought on August 11, 2025, to strike the "supplemental report" of Defendant's expert, Dr. McCraney, on the basis that it is not a supplemental report at all, but a new one that is inexcusably untimely, resulting in significant prejudice to Defendant. Plaintiff argues:

> There can be little doubt that the new report from Dr. McCraney fails to qualify as a "supplemental" report. It is entirely dedicated to criticisms of Dr. Trangle's report found nowhere in Dr. McCraney's

initial report. *Compare, e.g.*, Rapier Decl. Ex. B [McCraney Rep.] *with* Ex. C. [McCraney Supp. Rep.]. Indeed, neither Dr. Trangle nor his report are referenced anywhere in Dr. McCraney's original report, and Dr. Trangle's report is not listed among the materials Dr. McCraney considered in preparing his initial report. With respect to whether the information relied upon in the supplemental report was available when Dr. McCraney wrote his initial report, the only materials referenced in the supplemental report are (1) Dr. Trangle's expert report, which was served a month prior to Dr. McCraney's report; and (2) several academic articles that predate Dr. McCraney's initial report by years. *See id*. C [McCraney Supp. Rep.]. Defendant thus plainly could have—and should have—disclosed these opinions on the schedule set by the Court.

… Whether Dr. McCraney's report expressing new opinions based on previously available materials qualifies as a "supplemental" report is not a close question. Defendant simply failed to timely serve its expert report and waited until the eve of the close of discovery to spring it on Plaintiff.

[Doc. 232] at 3-4.

In addition, Plaintiff argues that the four recognized factors for assessing whether to strike an untimely expert disclosure: (1) the importance of the witnesses' testimony; (2) the prejudice to the opposing party of allowing the witnesses to testify; (3) the possibility of curing such prejudice by a continuance; and (4) the explanation, if any, for the party's failure to comply with the discovery order, *Riggio v. Pruneda*, No. 1:18CV218, 2019 WL 6827569, at *3 (S.D. Miss. Dec. 12, 2019), each weigh in favor of striking the supplemental report.

In summary, Plaintiff asserts that the "supplemental" report is not especially important to Defendant's case because Dr. McCraney's initial report contains his primary analysis, and his supplemental report is limited to rebutting Dr. Trangle's opinions which defense counsel may nevertheless cross Dr. Trangle on at trial. Plaintiff further argues that "by waiting to serve Dr. McCraney's untimely report until it was past the deadline for Plaintiff to provide a rebuttal report—and at a point at which it would be impracticable for Plaintiff to provide one before the discovery deadline—Defendant has skewed the evidence that will be presented to a jury. It will

now be the case that Defendant's expert can opine on the opinions of Plaintiff's expert, but not vice versa." [Doc. 232] at 5. Plaintiff also asserts that a continuance to cure the prejudice would unfairly add additional delay and increase the expense of the case—which has already had deadlines extended at Defendant's request [Doc. 192]; and that "Defendant has not yet offered any excuse for its tardy disclosure…." [Doc. 232] at 5-6.

In response to the motion to strike, Defendant asserts that Dr. McCraney's Supplemental Report is not untimely because it merely rebuts Dr. Trangle's deposition testimony to the effect that he personally interviewed Carter in connection with rendering his opinion, a fact not previously disclosed. And, since this disclosure was made only a day before Dr. McCraney supplemented his report, it was a timely rebuttal pursuant to Fed. R. Civ. P. 26(e)(1). [Doc. 249] at 7. Defendant also asserts the supplemental report of Dr. McCraney, in addition to being timely, "contains no new opinions." *Id.* at 8. The Defendant contends "[f]rom the outset, Dr. McCraney's opinions have been clear and consistent: Plaintiff's full thickness supraspinatus (rotator cuff) tear in his left shoulder is degenerative in nature (i.e. due to preexisting shoulder impingement), not the result of an acute traumatic event… What is truly new in this case is not Dr. McCraney's analysis, but Dr. Trangle's undisclosed reliance on a private interview with Plaintiff—revealed for the first time during his deposition. That undisclosed interview goes to the very foundation of Dr. Trangle's causation theory. Faced with this testimony, Dr. McCraney appropriately supplemented his report citing peer reviewed literature explaining why Dr. Trangle's reliance on a litigant's subjective self-reports is unreliable and inconsistent with accepted scientific methodology" *Id*. at 1-2.

As for the four-factor test, Defendant does not argue the weight of each factor, presumably because its position is that the report is neither untimely nor contains new opinions. Nevertheless, Defendant does contend Plaintiff has failed to demonstrate prejudice. *Id*. at 11.

Additional Law and Analysis

Expert witness disclosures are governed by Federal Rule of Civil Procedure 26 and Local Uniform Civil Rule 26(a)(2). Rule 26(a)(2) requires a party to disclose, among other things, the identity of any retained expert witness it may use at trial and a written, provide a signed report from the expert containing a complete statement of the expert's opinions and the basis and reasons for them, and the facts or data considered by the witness in forming those opinions. In addition, Local Uniform Civil Rule 26(a)(2) requires that:

> [a] party must make full and complete [expert] disclosure as required by Fed. R. Civ. P. 26(a)(2) and L.U. Civ. R. 26(a)(2)(D) no later than the time specified in the case management order.... Absent a finding of just cause, failure to make full expert disclosures by the expert designation deadline is grounds for prohibiting introduction of that evidence at trial....
> (B) An attempt to designate an expert without providing full disclosure information as required by this rule will not be considered a timely expert designation and may be stricken upon proper motion or sua sponte by the court.

L.U. Civ. R. 26(a)(2).

A party who learns that his expert disclosure is in some material respect incomplete or incorrect must supplement or correct the disclosure in a timely manner and in no event later than the discovery deadline. Fed. R. Civ. P. 26(e) and L.U. Civ. R. 26(a)(5). This duty to supplement extends both to information included in an expert's written report and to information given during the expert's deposition. Fed. R. Civ. P. 26(e). If the evidence is intended solely to rebut evidence on the same subject matter identified in another party's expert disclosure, the disclosure must be made within 30 days after the other party's disclosure. Fed. R. Civ. P. 26(a)(2)(D)(ii).

These legal principles were applied in *Goode v. City of Southaven*, No. 3:17CV60-DMB-RP, 2018 WL 3328019, at *3 (N.D. Miss. July 5, 2018), a case similar to this one, where, in relevant part, a defendant supplemented its expert opinion(s) after its deadline for designating— allegedly to either merely restate essentially the same opinions and facts or ones so close thereto as to constitute an "implicit corollary" of a previously stated opinion or fact, or were made to rebut new information disclosed for the first time by a plaintiff's expert at his recent deposition, making them proper under the applicable federal rules. In that case, plaintiff's counsel argued the opinions were new and they were not necessitated by plaintiff's disclosure in his deposition of new facts and or opinions disclosed therein.

Finding the case instructive, I will similarly analyze whether any or all of the opinions and facts stated in the supplemental report of Dr. McCraney are, under the circumstances of this case, timely disclosed, and if not, whether under the four-factor test outlined in *Riggio* they should be stricken in whole or part. 2019 WL 6827569, at *3 (S.D. Miss. Dec. 12, 2019). Essentially, the decision of what, if anything, in Dr. McCraney's supplemental report should be deemed untimely requires a determination of whether the facts and opinions in the supplemental report are considered new or are merely restatements of Dr. McCraney's prior opinions and facts relied on (or are so closely tracking the same as to defy characterization as "new"), or whether, if new, are made to rebut information disclosed for the first time in Dr. Trangle's deposition—namely Dr. Trangle's first-time disclosure that he conducted an interview of Plaintiff in connection with issuing his expert report.

## Analysis

The statements of fact or opinions in Dr. McCraney's supplemental report are analyzed in the order in which they appear.

Statement 1

In his supplemental report, Dr. McCraney writes:

> I disagree with Dr. Trangle's opinions for the reasons stated in my original report and my Independent Medical Examination report, which are incorporated herein by reference.

[Doc. 248], Exh. 7 at 1.

I find that because, and to the extent that, Dr. McCraney's original reports contain facts or opinions that are plainly opposite of certain of those in Dr. Trangle's report, the above statement in the supplemental report is not "new," and therefore, it is not untimely. Rather, I find this instance to be more akin to the circumstance in *Goode*, where a very similar statement in a supplemental report was found to be nothing more than an "implicit corollary" of the expert's prior disclosed opinions and facts that contradicted those of the opposing expert, though it did not name him. 2018 WL 3328019, at *3 (N.D. Miss. July 5, 2018). Stated differently, but to the same effect, I find Statement 1 of the supplemental report to be new and untimely but only to the extent it purports to have application to those opinions of Dr. McCraney appearing in his supplemental report found hereafter to be new and not resulting from information previously undisclosed.

Statement 2

In his supplemental report, Dr. McCraney writes:

> Dr. Trangle's opinion that Mr. Carter sustained a complete full-thickness tear of his supraspinatus tendon in the subject incident in the manner alleged by Mr. Carter is not supported by reliable scientific evidence or peer-reviewed scientific literature.

[Doc. 248], Exh. 7 at 1.

In his prior report, Dr. McCraney wrote:

> As reported in the peer-reviewed medical literature, the vast majority of rotator cuff tears are atraumatic in nature and

> result as the natural progression of shoulder impingement, which is a degenerative, chronic and congenital condition.

[Doc. 248], Exh. 3 at 3.

In my view, there is really no difference here, meaning this is not new, given that from the outset Mr. Carter has said his injury was caused by a traumatic railroad accident and Dr. McCraney has insisted the literature suggests traumatic causation is rare.

<u>Statement 3</u>

In his supplemental report, Dr. McCraney writes:

> I am not aware of any peer-reviewed scientific study that finds that the mechanism Mr. Carter describes as having caused his injury is sufficient to cause a full thickness tear· of the supraspinatus tendon. As set forth in the peer-reviewed scientific literature, if Mr. Carter had sustained a full-thickness tear of his left supraspinatus tendon in the subject incident, he would have immediately experienced pain, limitation of motion, and weakness in his left shoulder and arm.

[Doc. 248], Exh. 7 at 1.

In his prior report, Dr. McCraney wrote:

> As reported in the peer-reviewed medical literature, the vast majority of rotator cuff tears are atraumatic in nature and result as the natural progression of shoulder impingement, which is a degenerative, chronic and congenital condition.
>
> …
>
> If Mr. Carter had sustained an acute, massive tear of the rotator cuff in his reported incident, there would have certainly been a report of significant pain in his left shoulder, and physical limitations in his left shoulder would have been noted at the time of injury and found during the physical exam conducted at Baptist Desoto by Dr. Awan.

[Doc. 248], Exh. 3 at 3.

Here, I find the first sentence of Statement 3, "I am not aware of any peer-reviewed scientific study that finds that the mechanism Mr. Carter describes as having caused his injury is

sufficient to cause a full thickness tear of the supraspinatus tendon" is new, as the prior opinion, though close, was sufficiently less definite to qualify the supplemental statement as essentially the same. I further do not find that the new testimony was occasioned by any formerly undisclosed information. It is, therefore, untimely. The remainder of the quoted language in Statement 3 is not new or untimely.

<u>Statement 4</u>

In his supplemental report, Dr. McCraney writes:

> As documented in Mr. Carter's medical records produced in this case, all examinations of his shoulder by Desoto County EMS and at the Baptist Memorial Hospital-Desoto Emergency Room were completely normal. He did not complain of any pain in his left shoulder. He demonstrated no limitation of motion or weakness in his left shoulder or upper extremity during his physical exams.
>
> Consequently, there is no reliable scientific evidence to conclude that Mr. Carter's full-thickness supraspinatus tear occurred in the subject incident.

[Doc. 248], Exh. 7 at 1.

In his original report, Dr. McCraney wrote:

> If Mr. Carter had sustained an acute, massive tear of the rotator cuff in his reported incident, there would have certainly been a report of significant pain in his left shoulder, and physical limitations in his left shoulder would have been noted at the time of injury and found during the physical exam conducted at Baptist Desoto by Dr. Awan.
>
> When Mr. Carter presented to the Baptist Desoto ER, he did not complain of any left shoulder pain, all physical exams of his left shoulder were normal, and he had no visible signs of trauma.

[Doc. 248], Exh. 3 at 1.

Though obviously not an exact quote from the original report, this statement is not fairly characterized as a new opinion and is not untimely.

Statement 5

      In his supplemental report, Dr. McCraney writes:

> To a reasonable degree of medical probability, Mr. Carter sustained a full-thickness tear of his supraspinatus tendon prior to the subject incident due to his age, prior shoulder injuries, elevated body mass Index (BMI), and/or due to shoulder impingement related to the shape of his acromion, all of which are supported as causes of rotator cuff tears by the peer-reviewed scientific literature. As reported in the peer-reviewed scientific literature, such tears are often asymptomatic when they are degenerative and occur over time as Mr. Carter's tear did.

[Doc. 248], Exh. 7 at 1.

      In his original report, Dr. McCraney wrote:

> Although Mr. Carter claims that he never injured his left shoulder prior to the subject incident and was never treated for left shoulder pain prior to the subject incident, medical records reviewed demonstrate that Mr. Carter presented to the Greenwood Leflore Hospital ED for treatment of acute left shoulder injuries in 2004 and again in 2006. Following Mr. Carter's 2004 incident, an x-ray of his left shoulder showed an alteration to his AC joint. As discussed more fully below, Mr. Carter was also treated for bi-lateral shoulder pain in 2016 at Campbell Clinic by Dr. Sherman. Dr. Sherman diagnosed Mr. Carter with bi-lateral rotator cuff impingement and referred Mr. Carter to physical therapy. …

> It is my opinion that Mr. Carter's large rotator cuff tear in his left shoulder which was first diagnosed on June 8, 2021, developed slowly and asymptomatically over time as the result of impingement which was originally diagnosed in 2016, nearly 5 years before his reported incident…

> It is more likely than not that Mr. Carter's rotator cuff tear in his left shoulder preexisted Mr. Carter's reported incident.

[Doc. 248], Exh. 3 at 1.

      These are essentially the same opinions/facts as in the original report, so they do not qualify as new or untimely.

Statement 6

In his supplemental report, Dr. McCraney writes:

> Additionally, -it is not scientifically-reliable for Dr. Trangle to base his conclusions that Mr. Carter sustained a full-thickness supraspinatus tear in the subject incident on Mr. Carter's self-report or allegations.

[Doc. 248], Exh. 7 at 1.

I find that this statement could have been—but was not—addressed by Dr. McCraney in his original report since the fact that Dr. Trangle had relied for his causation opinion on Carter's allegations of how the accident happened was not first disclosed at Dr. Trangle's deposition, but in his original report, which was available to Dr. McCraney. In that report, Dr. Trangle wrote:

> As noted in the deposition of Mr. Carter, he specifically details what happened. He was reaching for the radio on the console in front of him, with his left arm outstretched. He apparently was attempting to mitigate injury by bracing his left-hand arm against the console, but he was not successful and his left shoulder painfully hit the console. He felt immediate pain in the left shoulder. The mechanism of having his entire body thrown inside the cab and trying to steady himself with his hands against the dashboard, could indeed lead to a tear of the rotator cuff. This is in all likelihood what occurred in this matter. The shoulder problem became more problematic with time.

[Doc. 248], Exh. 2 at 17.

Further, as set forth in Dr. McCraney's own expert report and IME report, he also relied for his causation opinions, at least in part, on Carter's allegations, the medical records, Carter's deposition, and his IME of Carter, regarding the particulars of the accident, albeit reaching a contrary opinion than Dr. Trangle.

Statement 7

In his supplemental report, Dr. McCraney writes:

> Peer reviewed scientific literature establishes that the premise that examinee reports are accurate as repeatedly failed scientific testing.

> *See* Barth, Robert J. Ph.D., *Examinee Reported History Is Not a Credible Basis for Clinical or Administrative Decision Making,* American Medical Association Guide's Newsletter(Sept./Oct.2009).

[Doc. 248], Exh. 7 at 1.

This is a new opinion and the fact that Dr. Trangle relied, at least in part, for his opinion on the examinee's own reports was disclosed by Dr. Trangle in his original report. Thus, the new opinion was not occasioned by a previous undisclosed fact or opinion.

<u>Statement 8</u>

In his supplemental report, Dr. McCraney writes:

> Scientific tests have further demonstrated that such histories are highly vulnerable to inaccuracies, specifically including inaccuracies that will mislead clinicians in their diagnostic, causation, and impairment evaluation work, and that will mislead administrators in their decision making. *Id.* The unreliability of examinee reports is especially pronounced when, as in this case, the examinee has filed a lawsuit.

> Consequently, reports from examinees are not a credible basis for clinical, forensic, or administrative decision making. *Id.* Additionally, the peer-reviewed scientific literature establishes that an examinee's underreporting of his prior medical history is especially pronounced in certain circumstances. For example, when examinees believe that a specific event (such as Mr. Carter's accident) is the cause their current complaints, they are more likely to underreport their health history for the time preceding that event and to overstate the extent of their problems for the time period that follows that event. *Id.* As further reported in the peer-reviewed scientific literature; claimants systematically distort their reported medical history in a fashion that potentially inflates the financial compensation for their claims. *Id.* One illustrative example in this case of this issue is Mr. Carter's repeated failure to disclose and/or his denial of the clear existence of his long-standing history of preexisting shoulder injuries, conditions, pain, disorders, rotator cuff impingement and related medical treatment to his experts and treating physicians. Another example is Mr. Carter's claim that he cannot return to work in any capacity due to his alleged ongoing left shoulder pain despite being released to return to medium level Work more than 3 years ago by his treating surgeon.

[Doc. 248], Exh. 7 at 1-2.

I find, as described above, with respect to Statement 7, that this is also entirely new and not based on any previously undisclosed information.

Turning now to the four factor test and their application to the facts and opinions found above to be new and not the result of newly disclosed information,[5] I conclude that the four factors weigh in favor of striking the same. Namely, I do not find that the importance of the untimely, new testimony is crucial, and in fact, these points may well be made on cross of Plaintiff's expert by counsel. Thus, this factor weighs in favor of striking the same; (2) the prejudice to Plaintiff of allowing the witness to testify to the specified untimely new material exists, but it is not so significant as to have a determinative weight. Particularly so, since, as noted, cross examination alone may make these same points; (3) the possibility of curing such prejudice by a continuance would appear to weigh in favor of striking the same since neither party appears to be willing to entertain a continuance; and (4) the explanation for the party's failure to comply with the disclosure deadline weighs in favor of striking the new untimely testimony since there is really no valid reason offered at all for failing to include it earlier.

<u>**Conclusion**</u>

For the reasons detailed above, the Court finds that Plaintiff's Motion to Strike the Supplemental Expert Report of Dr. William O. McCraney [Doc. 231] shall be and is hereby GRANTED IN PART AND DENIED IN PART. Statement 3 (the first sentence only); 6; 7; and 8 described above shall be stricken. Statement 1 of Dr McCraney's supplemental report is allowed, except as it relates to the foregoing-stricken Statements. Except as stricken, the supplemental opinion is allowed.

---

[5] *See*, discussion of Statement 1 above; Statement 3 (the first sentence only); Statement 6; Statement 7; and Statement 8.

**SO ORDERED** this the 30th day of September, 2025.

/s/ Jane M. Virden
**UNITED STATES MAGISTRATE JUDGE**